UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CECELIA BLANDA,

                          Plaintiff,


                                              **MEMORANDUM & ORDER**

        - against -                            05-CV-5723 (DRH)


MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,


                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**A P P E A R A N C E S :**

**MELTZER, FISHMAN, MADIGAN & CAMPBELL**
Attorneys for Plaintiff
225 Broadway, Suite 2605
New York, New York 10007
By: Brian J. Crawley, Esq.

**BENTON J. CAMPBELL**
**UNITED STATES ATTORNEY**
Attorney for Defendant
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201
By: John M. Kelly, Special Assistant U.S. Attorney


**HURLEY, Senior District Judge:**

*INTRODUCTION*

          Plaintiff Cecelia Blanda ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "Defendant") which denied her claim for disability benefits.  Presently

---

          [1]  Plaintiff's Complaint, which was filed on December 2, 2005, named Jo Anne B.
Barnhart, the former Commissioner of Social Security, as the defendant.  On February 12, 2007,
Michael J. Astrue took office as Social Security Commissioner.  He has therefore been
substituted as the main defendant in this matter pursuant to Federal Rule of Civil Procedure
25(d).

before the Court are: (1) Defendant's motion for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure ("Rule") 12(c) dismissing Plaintiff's Complaint; and (2) Plaintiff's

motion for judgment on the pleadings pursuant to Rule 12(c) remanding this matter back to the

Commissioner. For the reasons discussed below, the Commissioner's motion is granted,

Plaintiff's motion is denied, and the case is dismissed.

## BACKGROUND

### I.      Procedural Background

Plaintiff applied for disability benefits on October 11, 2000. (Tr. at 73.)[2] Plaintiff

claimed that she had been disabled since October 31, 1997 due to Huntington's disease.[3] (*Id.* at

73, 85.) In her disability report, Plaintiff reported that she was unable to work because her

illness affected her "memory, motor skills, writing ability, coordination, concentration [and]

attention span." (*Id.* at 85.)

After her application was denied initially (*id.* at 54-57), and on reconsideration

(*id.* at 58), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at

63.) A hearing was held before ALJ Iris K. Rothman on March 12, 2002, at which time Plaintiff,

who was represented by counsel, testified. (*Id.* at 16-51.)

ALJ Rothman considered Plaintiff's claims de novo and on April 19, 2002, issued

---

[2] References to "Tr." are to the Administrative Record filed in this case.

[3] "A rare abnormal hereditary condition characterized by chronic progressive chorea and mental deterioration that results in dementia. An individual afflicted with the condition usually shows the first signs in the fourth decade of life and dies within 15 years." *Mosby's Medical, Nursing & Allied Health Dictionary* 833 (6th ed. 2002). Chorea is "a condition characterized by involuntary purposeless, rapid motions, as flexing and extending of the fingers, raising and lowering of the shoulders, or grimacing." *Id.* at 355.

a decision finding that Plaintiff was not disabled. (*Id.* at 7-15.) The ALJ found that Plaintiff currently had Huntington's disease, anxiety, and depression but that the record failed to establish a severe impairment prior to March 31, 1998, the date last insured. (*Id.* at 10-15.)

Plaintiff requested that the Appeals Council review the ALJ's decision and by letter dated August 19, 2002, the Appeals Council declined to review the claim. (*Id.* at 3-5.) Thereafter, Plaintiff filed a civil action in this Court. (*See* docket no. 02-CV-5629.) By Stipulation and Order dated May 2003, the Court remanded the action for further administrative proceedings. (Tr. at 167-68.)

On remand, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ. (*Id.* at 171-72.) The Appeals Council Order instructed the ALJ to re-contact Plaintiff's three treating physicians, stating that "the medical evidence in this case was not adequately developed." (*Id.* at 171.)

On October 15, 2003, ALJ Rothman sent a letter to Plaintiff's three treating physicians. The letter asked the doctors to provide the following information:

> A statement clarifying the severity of your patient's condition for the period October 31, 1997 through March 31, 1998, including her symptoms and limitations of function during those years.
>
> In order to facilitate your response, enclosed are both physical and mental medical source statements which you may complete in lieu of a narrative statement. However, a narrative explanation for your assessments would be helpful.

(*Id.* at 176, 178, 180.) The ALJ's letter to Dr. Kousourou also requested his treatment records for the relevant time period. (*Id.* at 176.) The blank "physical and mental medical source statements" allegedly sent to the doctors are not part of the record.

On October 27, 2004, Plaintiff again appeared before ALJ Rothman, represented by present counsel. (*Id.* at 292-335.) Although Plaintiff's application for benefits indicated that her alleged onset date of disability was October 31, 1997, counsel moved to amend the alleged onset date of disability to June 30, 1997. (*Id.* at 300.) That application was granted. (*Id.* at 300-01.) At the hearing, Plaintiff, Plaintiff's husband, and medical expert Dr. Gerald Greenberg testified. (*Id.* at 294-335.)

By decision dated November 23, 2004, ALJ Rothman found that Plaintiff was not disabled as of the date last insured. (*Id.* at 158-65.) By notice dated October 7, 2005, the Appeals Council declined to assume jurisdiction of Plaintiff's case (*id.* at 151-53), thereby rendering the ALJ's most recent decision the final decision of the Commissioner. Plaintiff filed the instant action on December 2, 2005.

## II. Factual Background

### A. Non-Medical Evidence

Plaintiff was born on March 2, 1957. (*Id.* at 73.) She worked intermittently as a receptionist at an animal hospital from September 1992 to July 1997, and as a clerk at a retail store from March 1999 to October 1999.[4] (*Id.* at 86.)

---

[4] Plaintiff seeks disability benefits for the period June 1997 through March 31, 1998, the date she was last insured. At the first hearing, Plaintiff's counsel conceded that Plaintiff's work activity from March 1999 to October 1999 was too long to be considered an "unsuccessful work attempt" and, instead, would be considered a "trial work period." (Tr. at 31.) Work that an individual is forced to stop after a short period of time due to an individual's impairment is considered an "unsuccessful work attempt." 20 C.F.R. § 404.1574(a)(1). Earnings from an individual's unsuccessful work attempt will not show that an individual is able to do substantial gainful activity. *Id.* A work effort lasting more than six months cannot be considered an unsuccessful work attempt. *Id.* § 404.1574(c)(5). A trial work period is the period in which an individual may test his ability to work and still be considered disabled. *Id.* § 404.1592(a). A trial work period can last up to nine months and the months of work do not have to run

At the first hearing, on March 12, 2002, Plaintiff testified that she lives with her husband and her two sons. (*Id.* at 26.) She testified that she has difficulty driving because she has "no concentration whatsoever." (*Id.* at 27.)

Plaintiff reported that she graduated from high school and had no further education or training. (*Id* at 30.) She worked as a receptionist at an animal hospital until July 1997, when she stopped working because she was unable to work with computers and she forgot to give the doctors their messages. (*Id.* at 37-38.) She also worked for a podiatrist for eighteen months sometime from 1992 to 1997. (*Id.* at 33.) She was laid off from her last job at a clothing store in October 1999 because she would put clothes away and not remember where she put them. (*Id.* at 31.)

Plaintiff testified that as a result of her Huntington's disease, her symptoms at the end of 1997 to early 1998 included severe depression, and tics in her face, shoulders, and hands. (*Id.* at 41.) Medication helped her control about 70 to 75 percent of the tics but she experienced "side effects." (*Id.* at 41; *see also id.* at 42.) She stated that prior to 1999, her main symptom was depression. (*Id.* at 44-45.) The only thing that made her happy was working and the more she couldn't work, the more depressed she became. (*Id.* at 44.) She was able to do all of her household chores herself until approximately September 1998, at which time she needed her sons' help. (*Id.* at 46-49.)

Plaintiff testified that she was currently able to lift a gallon of milk in each hand, but not carry them; however, in 1997, when she stopped working, she had no problems lifting

_____

consecutively. *Id.*

and would have been able to carry them.  (*Id.* at 48-49.)  She had difficulty sitting, standing, and walking for two months prior to the hearing.  (*Id.* at 49-59.)

At the hearing held on October 27, 2004, Plaintiff's testimony was confused and disjointed.  (*Id.* at 302-09.)  She testified that she lost her job in the animal hospital because she became unable to type, became too slow, lost her concentration, and misfiled.  (*Id.* at 308-09.)

Plaintiff's husband also testified at the second hearing.  They married in 1981 when Plaintiff was 24 years old.  (*Id.* at 311.)  Her mental state was "fantastic" and "excellent." (*Id.* at 312.)  She was "outgoing," "bubbly," and did most of the driving.  (*Id.* at 312.)  He began to notice a change in her "around 1992."  (*Id.*)  She would fall down stairs, get angry, and make strange hand motions.  (*Id.*)  She became withdrawn and the house became dirty.  (*Id.* at 313.) She would say that she was unable to use the vacuum, she stopped cooking, and she became enraged.  (*Id.* at 313-14.)  While living in Queens (pre-1998), the police were called to her house because "she was screaming."  (*Id.* at 315.)  The police were called to her house four or five times in late 1992 to early 1993.  (*Id.* at 316.)

With respect to working, he testified that Plaintiff's employer at the animal hospital used to call her at home and tell her to come to work because she forgot to go.  (*Id.* at 310.)

**B.**    ***Medical Evidence Prior to March 31, 1998 (Date of Last Insured)***

**1.**    ***Dr. Prem Nehemiah - Plaintiff's Primary Care Physician***

The record reveals that Dr. Nehemiah treated Plaintiff in December 1994, August 1995, February 1997, February 1998, and March 1998.  (Tr. at 145-47.)  Although Dr. Nehemiah's notes are difficult to read, most of his records appear to reflect routine treatment.  In

February and March of 1998, he noted depression and anxiety and prescribed medication to treat them.  (*Id.* at 146-47.)

C.    *Medical Evidence After March 31, 1998 (Date of Last Insured)*

1.    *Dr. Prem Nehemiah - Plaintiff's Primary Care Physician*

Plaintiff was treated by Dr. Nehemiah in June and July of 1998.  (*Id.* at 147-48.) Dr. Nehemiah noted depression and anxiety and prescribed Valium.  (*Id.*)  He also gave her a referral to a psychiatrist.  (*Id.* at 148.)

On February 5, 2002, Plaintiff's counsel requested that Dr. Nehemiah "issue a report stating what [his] finding[s] on clinical examination were and if appropriate a statement of disability of at least back to March 31, 1998."  (*Id.* at 149.)  Dr. Nehemiah responded on March 15, 2002 with one sentence that read as follows: "[Plaintiff] was treated for anxiety and depression as of Jan 1998 and in my opinion could not hold a full time job."  (*Id.* at 150.)

2.    *Dr. Patrick E. Poole - Neurologist*

Plaintiff first began seeing Dr. Poole on October 5, 1998.  (*Id.* at 125.)  Dr. Poole reported that Plaintiff was seeing him for genetic testing and counseling.  (*Id.*)  He noted a family history of Huntington's disease.  (*Id.*)  He also noted that Plaintiff had not been able to hold a job for about ten years because of her inability to concentrate.  (*Id.*)  Plaintiff denied having tics and was otherwise in good health.  (*Id.*)  Dr. Poole noted choreiform[5] movements in her face, neck, and shoulders but noted that they were disguised through experience.  (*Id.*)  His plan was to place Plaintiff on Haldol and Prozac and noted that she was taking Wellbutrin and Valium.  (*Id.*)

_____

[5] Involuntary, purposeless, rapid motions.  *Mosby's* at 355.

Dr. Poole treated Plaintiff about every three months from October 1998 to 2001. Over the course of his treatment, he noted remissions and exacerbations of the choreiform movements.  (*Id.* at 115-27.)  He prescribed Prozac, Valium, and other medications.  Although he had assessed her condition as chorea (*id.* at 120, 122), at Plaintiff's request he obtained genetic testing (*id.* at 119), which confirmed that Plaintiff had Huntington's disease.  (*Id.* at 119.)

In a report to the New York State Office of Temporary and Disability Assistance, dated February 15, 2001, Dr. Poole reported that Plaintiff was "fatally disabled" and had Huntington's Disease.  (*Id.* at 136.)  He described her disease as "untreatable, progressive [and] relentless."  (*Id.* at 137.)  He noted that she cannot tandem walk unaided, cannot walk "toe - toe" or "heel - heel," and that she had weak muscle strength.  (*Id.* at 138; *see also id.* at 137.)  Her mental status was recorded as "progressive dementia with depression."  (*Id.* at 139.)

In response to requests by Plaintiff's counsel and ALJ Rothman, Dr. Poole submitted several retrospective opinions of Plaintiff's condition.  In a letter dated September 24, 2002, Dr. Poole stated that Plaintiff suffers from Huntington's disease and that she developed her symptoms when she was 33 years old (in 1990).  (*Id.* at 289.)  He also stated that Plaintiff "is fully disabled."  (*Id.*)

By letter dated November 3, 2003, Dr. Poole reiterated that Plaintiff suffers from Huntington's disease, that she developed her symptoms when she was 33 years old, and that she "is fully disabled and unable to work."  (*Id.* at 290.)

On September 22, 2004, Dr. Poole completed a physical capacities assessment questionnaire.  (*Id.* at 229-31.)  He found Plaintiff's physical capacities to be so reduced that she

would be unable to perform even sedentary work.  (*Id.*)

Finally, on September 28, 2004, Dr. Poole wrote a letter stating that Plaintiff suffers from Huntington's disease and that she "is fully and permanently disabled by definition under category 11.17.[6]  She has certainly been disabled since I first saw her in 1998." (*Id.* at 291.)

### 3.    *Dr. Harry Kousourou*

Dr. Kousourou treated Plaintiff from May 21, 1999 through September 2004.  (*Id.* at 232-84.)  Dr. Kousourou reported that Plaintiff had a history of major depressive disorder/anxiety, as well as Huntington's disease, and that she had been fairly stable on Prozac and Valium.  (*Id.* at 284.)  Dr. Kousourou advised Plaintiff to follow up with Dr. Poole for her Huntington's disease.  (*Id.* at 284.)  His treatment notes reflect Plaintiff's complaints of depression, anxiety, short-term memory loss, and fatigue.  (*Id.* at 232-84.)

### 4.    *Dr. Eric Hoffman*

On February 23, 1999, Plaintiff was examined by Dr. Hoffman.  (*Id.* at 287.) Plaintiff's problems were noted to be Huntington's chorea, depression, and asthma.  (*Id.*)  Dr. Hoffman diagnosed Huntington's chorea and ordered laboratory tests.  (*Id.*)

### 5.    *Dr. S. Gowd*

On January 26, 2001, Dr. Gowd, a state agency medical consultant, reviewed the record and indicated that there was insufficient evidence prior to March 1998 to assess the severity of Plaintiff's medical condition.  (*Id.* at 128-35.)

### 6.    *Dr. Gerald Greenberg - Board Certified Internist*

---

[6]  Listing 11.17 of the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1.

Dr. Greenberg testified at the hearing held on October 27, 2004 as a medical expert. (*Id.* at 316-33.) After reviewing the record, Dr. Greenberg stated that while there were references to anxiety and depression, it was very difficult to determine whether the depression met or equaled the severity of any listing in 20 C.F.R. § 404, Subpart P, Appendix 1, prior to March 31, 1998. (*Id.* at 318-20.) He testified that while there were some retrospective statements, there was no objective evidence indicating the severity of the depression. (*Id.* at 319.) Similarly, he stated that although Plaintiff's depression and anxiety could have reduced her ability to concentrate, it was not possible to determine the extent on the present record. (*Id.* at 323.) Finally, with regard to Plaintiff's Huntington's disease, he noted that Plaintiff's diagnosis was not made until after the date of last insured (*id.* at 321), and that there was no indication that Plaintiff had any symptoms of Huntington's disease prior to that date that would have interfered with her ability to perform basic work related functions. (*Id.* at 322.)

## DISCUSSION

### I. Standard of Review

#### A. Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to

support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the

Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. §

405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*,

362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).

### B.    *Eligibility for Disability Benefits*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a

claimant must establish that he is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  The SSA further states that this impairment must be "of

such severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy . . . ."  *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for

evaluating disability claims.  *See* 20 C.F.R. § 404.1520.  This Circuit has described the

procedure as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and

> work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C. *The Treating Physician Rule/The ALJ's Obligation to Develop Record*

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79.[7] The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Halloran,* 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the

---

[7] "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id.* § 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's *retrospective* diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1ˢᵗ Cir. 2001)),

*amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005).  Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled."  20 C.F.R. §§ 404.1512(e), (e)(1).  The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source."  *Id.* § 404.1512(e)(1).  The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings."  *Id.* § 404.1512(e)(2).  If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations.  *Id.* § 404.1512(f).

## II.    *The ALJ's Decision*

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had satisfied the first two steps, to wit: (1) Plaintiff had not engaged in substantial gainful activity from June 30, 1997 through March 31, 1998; and (2) Plaintiff had a severe impairment, viz. depressive disorder.  The ALJ also found that during the relevant time period, Plaintiff's Huntington's disease was not a severe impairment.

The ALJ concluded that Plaintiff did not meet the third step, however, because her impairment neither met nor equaled in severity any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations.  Because the ALJ found that Plaintiff's ailments did not qualify as a per se disability under the listings, the ALJ went on to

analyze the fourth factor, i.e., whether Plaintiff's impairment precluded performance of her past relevant work. The ALJ found that it did, finding that Plaintiff was unable to return to her past work as a receptionist due to her depression.

Once the ALJ determined that Plaintiff was not able to perform her past work, the ALJ analyzed the fifth and final step, viz. whether the Commissioner had established that there was other work Plaintiff could have performed. In this regard, the ALJ found that despite Plaintiff's depressive disorder, "she was capable of performing the basic mental demands of unskilled work" as she "was capable of understanding, remembering and carrying out simple instructions, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting." (*Id.* at 164.) Taking into account Plaintiff's age, education, and functional capacity, the ALJ applied Medical-Vocational Rule 204.00, 20 C.F.R. § Part 404, Subpart P, Appendix 2, and found that Plaintiff was not disabled under the SSA.

**III.**    *Application of the Governing Law to the Present Case*

Plaintiff asserts the following three arguments in support of her contention that the ALJ's decision should be overturned: (1) the ALJ did not adequately develop the record; (2) the ALJ erred in finding that Plaintiff's Huntington's disease was not severe prior to March 31, 1998; and (3) the ALJ improperly relied on the medical-vocational grids in finding that Plaintiff was not disabled. For the reasons that follow, the Court finds that Plaintiff's arguments have no merit; accordingly, the ALJ's November 23, 2004 decision is affirmed.

**A.**    *The ALJ Adequately Developed the Record in this Case*

Plaintiff argues that the ALJ failed in her duty to re-contact Plaintiff's treating

physicians because she allegedly did not include the medical assessment forms with her requests for more information, and because she should have made further attempts at re-contacting the doctors.  Plaintiff's arguments are addressed below.

### 1. *The Record*

The record reflects the ALJ's difficulty in obtaining information from Plaintiff's treating sources.  At the first hearing on March 12, 2002, Plaintiff's counsel indicated that Dr. Nehemiah would not provide him with a statement of Plaintiff's condition during the relevant time period because he had not seen Plaintiff in "so long."  (*Id.* at 21.)  The ALJ advised Plaintiff's counsel that the record was scant concerning the severity of Plaintiff's impairments and the dates they became severe.  (*Id.* at 50.)  Plaintiff's counsel responded that he would re-contact Dr. Nehemiah and would also write to Dr. Poole to obtain further clarification.  (*Id.* at 50.)  The ALJ indicated that she would keep the record open to enable counsel to garner this information.  (*Id.*)

Dr. Nehemiah responded in a one-sentence letter dated March 15, 2002, that Plaintiff "was treated for anxiety and depression as of Jan 1998 and in my opinion could not hold a full time job."  (*Id.* at 150.)  There is no record of any response by Dr. Poole.

By decision dated April 19, 2002, the ALJ denied Plaintiff's claim.  (*Id.* at 10-15.)  By Stipulation and Order dated May 9, 2003, this Court remanded the case to the Commissioner.  On remand, the Appeals Council instructed the ALJ to "undertake further medical development, contacting all applicable treating sources for additional medical evidence, with supporting documentation/rationale for any medical assessments/conclusions reached.  If necessary, testimony from a medical expert will be obtained."  (Tr. at 172.)

On October 15, 2003, approximately one year prior to the hearing on remand, ALJ Rothman sent letters to Plaintiff's three treating physicians, viz. Drs. Kousourou, Nehemiah, and Poole, requesting a statement "clarifying the severity of [Plaintiff's] condition for the period <u>October 31, 1997 through March 31, 1998</u>, including her symptoms and limitations of function during those years." (*Id.* at 176, 178, 180.) ALJ Rothman's letter to Dr. Kousourou additionally requested his treatment records for the same time period. (*Id.* at 176.) All three letters stated as follows:

> In order to facilitate your response, enclosed are both physical and mental medical source statements which you may complete in lieu of a narrative statement. However, a narrative explanation for your assessments would be helpful.

(*Id.* at 176, 178, 180.)

Drs. Kousourou and Nehemiah did not reply to ALJ Rothman's letters. By letter dated November 3, 2003, Dr. Poole responded by summarily stating that Plaintiff suffers from Huntington's disease, that she developed her symptoms when she was 33 years old (1990) and that she "is fully disabled and unable to work." (*Id.* at 290.)    This two-line response essentially mirrors Dr. Poole's September 2002 (*id.* at 289) and September 2004 letters (*id.* at 291), which were apparently sent in response to requests by Plaintiff's counsel.

The second hearing was conducted on October 27, 2004. When the ALJ asked Plaintiff's counsel why Dr. Poole did not complete the report she asked him to complete, Plaintiff's counsel responded:

> Why I can't tell you. I can tell you my experience with his offices. We – I wrote him a letter. I wrote him two letters actually. It's very difficult to get records out of them. He's apparently very busy. And then when I got his September 28, 2004 letter, I asked him if he could clarify and link back and by the time I had written

to him, he was already gone on vacation for a month, so I was not
able to get an assessment from Dr. Poole --

(*Id.* at 298.)

Plaintiff's counsel then asked the ALJ to leave the record open so that he could

obtain a retrospective opinion from Dr. Poole concerning Plaintiff's condition pre-March 1998.

(*Id.* at 299-200.)  The ALJ refused, noting:

> I'm not really inclined to keep this record open any further.  This
> has been open for years and last year I asked Dr. Poole to do just
> what you're saying you want to ask him, and you've had plenty of
> opportunity to do that in the few months that's passed.  In fact, this
> case was originally scheduled to be heard in June and it was put
> over until December at your request, so you had an extra six
> months to do this.
>
> . . . .
>
> [] I'm not inclined to keep the record open any further.  It's stale
> already and I don't even know why we had to be jumping through
> hoops to try to get opinions that doctors refuse[d] to give us before,
> but we have a medical expert here, and we'll he[ar] his opinion as
> to [Plaintiff's] condition during the relevant period.

(*Id.* at 300.)

## 2. *Plaintiff's Arguments Have no Merit*

Plaintiff argues that because copies of the blank "physical and mental medical

source statements" are not part of the record, they must not have been sent with the ALJ's letters

to the doctors.  This assertion is mere speculation.  In fact, all three letters suggest that the

statements were mailed because the term "Enclosures" is included at the bottom thereof.  (*Id.* at

177, 179, 181.)  Even if the forms were not enclosed, the ALJ requested that the doctors provide

a statement clarifying the severity of Plaintiff's condition, including her symptoms and

limitations.  Contrary to Plaintiff's contention, then, it is not true that "without those medical

18

source statements, the physicians were left to guess at what the ALJ wanted." (Pl.'s Mem. in Supp. at 10.)

Plaintiff also contends that the ALJ erred by refusing to leave the record open so that an effort could have been made to re-contact Dr. Poole to obtain further clarification. The Court disagrees and finds that the ALJ satisfied her duty to develop the record.

In compliance with the directive of the Appeals Council, as well as 20 C.F.R. § 404.1512(e),[8] the ALJ attempted to obtain the opinions from Plaintiff's treating doctors by sending them letters asking for clarification. As noted above, Drs. Kousourou and Nehemiah did not respond. Dr. Poole responded in a letter dated November 5, 2003. (*Id.* at 290.) This two-line response mimics Dr. Poole's September 2002 (*id.* at 289) and September 2004 letters. (*Id.* at 291.) After having received Dr. Poole's *three* conclusory statements in response to *three* separate requests for information, the ALJ committed no legal error by refusing to leave the record open to provide Dr. Poole with yet another opportunity to submit a more detailed response. *See* 20 C.F.R. § 404.1512(e)(2) ("We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.").[9]

In sum, the Court rejects Plaintiff's arguments that the ALJ failed to adequately

---

[8] Pursuant to 20 C.F.R. §§ 404.1512(e), the Commissioner is required to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled."

[9] Notably, Dr. Poole did not even treat Plaintiff prior to March 31, 1998, the date Plaintiff was last insured. Dr. Poole began treating Plaintiff in October 1998 and his treatment records for this period of time were obtained. In fact, the only doctor to treat Plaintiff pre-March 1998 was Dr. Nehemiah and his treatment notes are part of the record as well.

develop the record in this case.

**B.**      ***The ALJ did not Err in Finding that Plaintiff's
Huntington's Disease was not Severe Prior to March 31, 1998***

Plaintiff argues that the ALJ erred in concluding that her Huntington's disease
was not a severe impairment prior to March 31, 1998, the date of last insured.[10]  She contends
that the ALJ did not adequately consider her husband's testimony that Plaintiff's demeanor
changed dramatically in 1992, the testimony by Dr. Greenberg that Plaintiff's behaviors were
possible manifestations of Huntington's disease, the letters from Dr. Poole indicating that
Plaintiff developed her symptoms when she was 33 years old, and a letter from Plaintiff's former
employer (animal hospital) indicating that there were times Plaintiff forgot to show up for work
and that she was not fulfilling her job responsibilities.  (*Id.* at 225.)  She also argues that the ALJ
should have considered the onset of her Huntington's disease pursuant to SSR 83-20.  For the
reasons stated below, the Court finds Plaintiff's arguments unpersuasive.

**1.**      ***Severity at Step Two of the Sequential Analysis***

Plaintiff has the burden at step two in the sequential evaluation process to
demonstrate the severity of her impairment.  20 C.F.R. § 404.1520(c) provides, in pertinent part:

> You must have a severe impairment. If you do not have any
> impairment or combination of impairments which significantly
> limits your physical or mental ability to do basic work activities,
> we will find that you do not have a severe impairment and are,
> therefore, not disabled. We will not consider your age, education,
> and work experience.

> An impairment is not severe if it does not significantly limit a claimant's ability to

---

[10] The ALJ did find that Plaintiff's depressive disorder was a severe impairment,
however.

do basic work activities.  20 C.F.R. § 404.1521(a).  The regulations define "basic work

activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) Physical functions such as walking, standing, sitting, lifting,
> pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple
> instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual
> work situations; and
> (6) Dealing with changes in a routine work setting.

*Id.* § 404.1521(b).  The Second Circuit has warned that the step two analysis may not do more

than "screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).

### 2.    *Medical Evidence Prior to March 1998*

The only medical evidence in the record prior to March 1998 is from Dr.

Nehemiah, who treated Plaintiff in December 1994, August 1995, February 1997, February

1998, and March 1998.  (Tr. at 145-47.)  Although Dr. Nehemiah's notes are difficult to read,

most of his records appear to reflect routine treatment and make no reference to Huntington's

disease or its symptoms.  The only notations of significance in Dr. Nehemiah's notes are

references to Plaintiff's depression and anxiety, for which Dr. Nehemiah prescribed medications

to treat.  (*Id.* at 146-47.)

Dr. Poole, who treated Plaintiff from October 1998 to 2001, first noted Plaintiff's

symptoms of Huntington's disease in October 1998.  (*Id.* at 125.)  His diagnosis was confirmed

through genetic testing in 2001.  (*Id.* at 119.)  In response to requests from ALJ Rothman and

Plaintiff's counsel, Dr. Poole summarily indicated in three letters dated September 2002,

November 2003, and September 2004, that Plaintiff developed her symptoms when she was 33

years old (in 1990) and that she has been disabled since the first time he saw her in October 1998.  (*Id.* at 289-91.)

On January 26, 2001, Dr. Gowd, a state agency medical consultant, indicated that there was insufficient evidence prior to March 1998 to assess the severity of Plaintiff's medical condition.  (*Id.* at 128-35.)

At the hearing on October 27, 2004, Dr. Greenberg stated that there was nothing in the record to indicate that Plaintiff's Huntington's disease was severe prior to March 1998. (*Id.* at 320-21.)  In fact, he noted, the record revealed that Plaintiff was "neurologically stable" as of August 2000.  (*Id.* at 322.)  He also testified that the evidence showed that there was an increase in symptoms in 2001 and that Plaintiff's tics did not begin until after March 31, 1998. (*Id.* at 320-21.)

### 3.    *Non-Medical Evidence Prior to March 1998*

Plaintiff testified that she stopped working as a receptionist at an animal hospital in July 1997 because she "couldn't catch on to the computer" (*id.* at 37) and because she would forget to give the doctors their telephone messages.  (*Id.* at 38.)  She also testified that at that time, she had difficulty balancing her money.  (*Id.*)  At one point in her testimony, she stated that her tics were bad at the end of 1997 to early 1998 (*id.* at 41), but later stated that her tics had gotten worse and that they were "not too bad" in 1997 and 1998.  (*Id.* at 42.)  She also stated that her main symptom was depression before 1999.  (*Id.* at 44.)

On September 25, 2002, the office manager at Plaintiff's former employer, viz. The Bellerose Animal Hospital, wrote a letter stating that Plaintiff "was a pleasant receptionist who got along with clients and staff members.  There were times when [Plaintiff] forgot to show

22

up for work and we had to call her at times to remind her when she was due to work next.  We separated because she was not fulfilling her job responsibilities."  (*Id.* at 225.)

Plaintiff's husband testified that he began to notice a change in Plaintiff "around 1992" in that she would fall down stairs, get angry, and make strange hand motions.  (*Id.* at 312.) He further testified that prior to 1998, Plaintiff would become enraged over "nothing" and that the police were called to their house several times due to her screaming.  (*Id.* at 313-16.)

### 4.       *The ALJ's Decision is Supported by Substantial Evidence*

Based upon the totality of the medical and non-medical evidence, the Court concludes that there is substantial record support for the ALJ's finding that Plaintiff's Huntington's disease was not a severe impairment before March 1998.  Records from the only doctor to have treated Plaintiff during the relevant time period, Dr. Nehemiah, make no reference to the disease or its symptoms.  In fact, Plaintiff's medical records do not reflect symptomatology consistent with Huntington's disease until October 1998, approximately seven months after the date of last insured.

Although there is a retrospective letter from Dr. Poole conclusorily stating that Plaintiff developed her symptoms in 1990 and had been disabled since October 1998, Dr. Poole's letter is not entitled to controlling weight as he was not a treating physician during the period in contention, i.e., June 30, 1997 to March 1998.  *See Monette v. Astrue*, No. 06-2510-cv, 2008 WL 695370, at *3 (2d Cir. Mar. 14, 2008) (summary order).  In fact, he did not begin treating Plaintiff until October 1998.

The fact that Dr. Poole was not treating Plaintiff "at the time referenced in [his] retrospective opinion does not mean that [his] opinion should not be given some, or even

significant weight." *Id.* Nonetheless, the Court finds no error in the ALJ's refusal to accord Dr. Poole's retrospective opinion significant weight. Firstly, although Dr. Poole indicated that Plaintiff developed symptoms of Huntington's disease in 1990, this does not mean that they imposed any significant, work-related limitations so as to qualify her impairment as severe. Next, Dr. Poole's retrospective opinion is contradicted by Dr. Nehemiah's notes during the relevant time period, which make no mention of Huntington's disease or its symptoms, but only note Plaintiff's depression. Finally, Dr. Poole's retrospective opinion is wholly conclusory and unsupported by his own treatment records, which do not support a finding that Plaintiff's condition was at a disabling level of severity even as of October 1998, when he began treating her.

Contrary to Plaintiff's contentions, medical expert Dr. Greenberg merely testified that Plaintiff's husband's descriptions of Plaintiff's behaviors were *possible* manifestations of Huntington's disease. Dr. Greenberg further testified that there was an increase in Plaintiff's symptoms in 2001 and that the record indicated that Plaintiff did not experience physical symptoms until after October 1998.

Non-medical evidence also supports the ALJ's finding. Plaintiff's testimony was inconsistent. She testified that she was unable to perform her job at the animal hospital due to memory loss but then stated that her primary problem at the time was depression only. She stated that her tics were bad during the relevant time period, but later stated they were not "too bad." She asserted that she was able to do all of the chores and shopping by herself until approximately September 1998, at which time she needed her sons' help.

Although Plaintiff's husband testified that Plaintiff's mental attitude changed in

1992, and Plaintiff's employer wrote a letter in September 2002 stating that Plaintiff did not show up for work at times and was separated because she was not fulfilling her job responsibilities, this lay evidence does not demonstrate that Plaintiff's impairment at that time, if any, rose to the level of severe as that term has been defined by the governing regulations.

Accordingly, the Court finds that substantial evidence supports the ALJ's decision that Plaintiff's ability to perform basic work activities was not "significantly limited" due to her Huntington's disease prior to March 31, 1998. Given that Dr. Nehemiah's notes, Plaintiff's only treating physician during the relevant time period, contain *no* reference to any symptomatology consistent with Huntington's disease, together with Plaintiff's inconsistent testimony regarding the severity of her symptoms pre-March 1998, ALJ Rothman could have reasonably concluded that Plaintiff's Huntington's disease did not qualify as a severe impairment pre-March 1998.

### 5.    *SSR 83-20*

Finally, Plaintiff argues that the ALJ erred in failing to follow the mandates of SSR 83-20 which explains, among other things, that a claimant's onset date may have to be inferred. It provides that that although "[m]edical evidence serves as the primary element in the onset determination," SSR 83-20, 1983 WL 31249 (1983), at *2:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

*Id.* at *3.

SSR 83-20 further states that the ALJ "should call on the services of a medical adviser when onset must be inferred." *Id.* "If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation." *Id.* at *3. However, "[t]he impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record." *Id.*

The Commissioner argues that SSR 83-20 is not applicable to this case because Plaintiff was not found to be disabled and, therefore, there was no onset date to be determined. (Def.'s Reply Mem. at 9.) The Commissioner does not cite any case law in support of this proposition and Plaintiff did not respond to the Commissioner's argument.

In *Baladi v. Barnhart*, the Second Circuit found that "SSR 83-20 is inapplicable to the decision under review, because the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date." 33 Fed. Appx. 562, No. 01-6155, 2002 WL 507139, at *2 (2d Cir. Apr. 4, 2002) (unpublished summary order). In that case, the plaintiff claimed disability due to back, leg, and neck pain, as well as depression. *Id.* *1. The ALJ found that plaintiff was capable of performing his past relevant work and was therefore not disabled. *Id.*

The Sixth and Seventh Circuits have similarly applied restrictive interpretations of SSR 83-20. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (finding that SSR 83-20 "applies only when there has been a finding of disability and it is necessary to determine when the disability began"); *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date. In short,

SSR 83-20 does not apply.").

The instant action is distinguishable from the three cases cited above. Although there has been no finding in the present suit that Plaintiff was disabled as a result of her Huntington's disease prior to the date last insured, it is undisputed that she currently suffers from Huntington's disease, a slowly progressive impairment. Thus, SSR 83-20 may be relevant in determining the onset of Plaintiff's Huntington's disease. *See McManus v. Barnhart*, No. 5:04-CV-67-OC-GRJ, 2004 WL 3316303, at *6 (M.D. Fla. Dec. 14, 2004) ("Because the issue of onset is inextricably tied to the determination of disability in cases where the impairment is a slowly progressive condition that is not traumatic in origin, the Court concludes that the most logical interpretation of SSR 83-20 is to apply it to situations where the ALJ is called upon to make a retroactive inference regarding disability involving a slowly progressive impairment, and the medical evidence during the insured period is inadequate or ambiguous."). The Court need not resolve this issue, however, because even assuming arguendo that SSR 83-20 is applicable, ALJ Rothman proceeded entirely in accord therewith. Recognizing that there was scant medical evidence in the record concerning Plaintiff's medical condition during the time period in contention, ALJ Rothman sought out the advice of Dr. Greenberg, a medical advisor, to assist her in determining whether Plaintiff's Huntington's disease constituted a disability prior to the date last insured. She also considered Plaintiff's statements and testimony at the hearings. Thus, although the ALJ did not explicitly reference SSR 88-20 in her decision denying benefits, even assuming its applicability, that provision does not aid Plaintiff's claim.

In sum, the Court rejects Plaintiff's arguments concerning the severity of her Huntington's disease during the time period at issue and finds that the ALJ's finding is supported

by the substantial evidence.

**C.**     ***The ALJ Properly Relied on the Medical-Vocational***
***Guidelines in Determining that Plaintiff was Not Disabled.***

Lastly, Plaintiff claims that because of her depression, the ALJ improperly relied on the Medical-Vocational guidelines found in 20 C.F.R., Part 404, Subpart P, Appendix 2. She claims that the Second Circuit has repeatedly held that an ALJ may not rely on the Medical-Vocational guidelines if a claimant suffers from nonexertional impairments, such as depression, and must instead introduce testimony of a vocational expert. Plaintiff misstates the applicable legal standards.

Pursuant to the five-step analysis articulated above, once a disability claimant proves that her severe impairment prevents her from performing her past work, the Secretary then has the burden of proving that the claimant retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy. *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). "In the ordinary case the Secretary satisfies his burden by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Id.* However, the grids only account for exertional limitations, that is, those that relate to the ability of a claimant to "meet the strength demands of jobs," i.e., "sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 404.1569a(b). Thus, where a claimant has an exertional impairment, the grids are directly applicable. *Id.* If a claimant has an impairment or combination of impairments resulting in both strength limitations *and* nonexertional limitations,[11] the grids are not directly applicable unless there is a rule directing a

_____

[11]   A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes anxiety

conclusion that the claimant is disabled based upon strength limitation; otherwise, the grids

"provide a framework to guide the [Secretary's] decision." *Id.* § 404.1569a(d).

Here, the ALJ found that Plaintiff suffered from severe depressive disorder, a

nonexertional impairment. The regulations specifically direct that where the individual has

solely a nonexertional type of impairment, "the rules in appendix 2 do not direct factual

conclusions of disabled or not disabled." *Id.* § 404.1569a(c)(2). Instead, "the determination as

to whether disability exists will be based on the principles in the appropriate sections of the

regulations." *Id.*; *see also* SSR 85-15, 1985 WL 56857 (1985), at *1.

The Second Circuit has provided further guidance with respect to determinations

as to the impact of nonexertional limitations on the application of the grids and the evidence

required to support determinations as to the ability of claimants with such limitations to work:

> [T]he mere existence of a nonexertional impairment does not
> automatically require the production of a vocational expert nor
> preclude reliance on the guidelines. A more appropriate approach
> is that when a claimant's nonexertional impairments significantly
> diminish his ability to work-over and above any incapacity caused
> solely from exertional limitations-so that he is unable to perform
> the full range of employment indicated by the medical vocational
> guidelines, then the Secretary must introduce the testimony of a
> vocational expert (or other similar evidence) that jobs exist in the
> economy which claimant can obtain and perform.
>
> . . . .
>
> [W]e hold that application of the grid guidelines and the necessity
> for expert testimony must be determined on a case-by-case basis.
> If the guidelines adequately reflect a claimant's condition, then
> their use to determine disability status is appropriate. But if a
> claimant's nonexertional impairments significantly limit the range
> of work permitted by his exertional limitations then the grids

---

and depression. 20 C.F.R. § 404.1569a(c).

obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments. Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate. By the use of the phrase "significantly diminish" we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Bapp*, 802 F.2d at 603, 605-06 (internal citation and quotation marks omitted).

Thus, where a claimant's work capacity is significantly diminished beyond any exertional limitation, application of the grids is inappropriate because the grids do not take nonexertional limitations into account. However, where a nonexertional impairment does not have a significant effect on the claimant's range of possible work, "the reductions in work capacity caused by nonexertional impairments will not invalidate the presumptions created by the grids." *Bapp*, 802 F.2d at 606 n.1; *see also Taylor v. Barnhart*, 83 Fed. Appx. 347, No. 03-6072, 2003 WL 22769623, at *3 (2d Cir. Nov. 21, 2003) (unpublished summary order) (finding that ALJ properly relied on grids without vocational expert testimony where claimant's nonexertional limitations did not significantly diminish claimant's work capacity under *Bapp*); *Carlson v. Barnhart*, No. 3:05CV1584, 2006 WL 2926818, at *14 (D. Conn. Aug. 30, 2006) ("Only if the claimant's non-exertional impairments 'significantly diminish' the range of work allowed by the claimant's exertional limitations is use of grids inappropriate.") (quoting *Bapp*, 802 F.2d at 605); *Copeland v. Comm'r of Soc. Sec.*, No. 05-CV-3684, 2006 WL 2095722, at *7 (E.D.N.Y. July 27, 2006) ("Here, as the ALJ recognized, Copeland's seizure disorder imposes non-exertional limitations; the ALJ was therefore obliged to determine (based on substantial evidence) whether those limitations significantly reduced the number of jobs she could do. If

they did not, then the ALJ should have relied solely on the Grids; if they did, then evidence regarding the jobs Copeland could do despite *all* her limitations (either from a vocational expert or some other source) would have been necessary."); *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495, at *8 (S.D.N.Y. Nov. 29, 2001) ("[T]he use of a vocational expert is not mandatory unless the ALJ first finds that the nonexertional impairment so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.") (citations and internal quotation marks omitted).

Here, the ALJ found that Plaintiff was "capable of performing the basic mental demands of unskilled work, in spite of her depressive disorder." (Tr. at 164.) She further found that Plaintiff "was capable of making a successful adjustment to work that exists in significant numbers in the national economy. The evidence supports a finding that [Plaintiff] was capable of understanding, remembering and carrying out simple instructions, responding appropriately to supervision, co-workers and usual work situation, and dealing with changes in a routing work setting." (*Id.*) She concluded that a finding of "not disabled" was warranted "within the framework of Rule 204.00 of the Medical Vocational Guidelines." (*Id.*)

The Court finds that the ALJ's findings were supported by the substantial evidence. The only medical evidence on how Plaintiff's depression affected her ability to work is the retrospective opinion of Dr. Nehemiah, Plaintiff's treating physician during the relevant time period. This one-sentence letter, which was written in response to a February 5, 2002 request by Plaintiff's counsel that Dr. Nehemiah "issue a report stating what [his] finding[s] on clinical examination were and if appropriate a statement of disability of at least back to March 31, 1998" (Tr. at 149), provides as follows: "[Plaintiff] was treated for anxiety and depression as

of Jan 1998 and in my opinion could not hold a full time job."  (*Id.* at 150.)

The Court finds that the ALJ did not err in failing to place controlling weight on Dr. Nehemiah's assessment.  There is nothing in Dr. Nehemiah's notes which supports this conclusion and despite efforts by counsel and ALJ Rothman to obtain more information, Dr. Nehemiah proffered no explanation for his finding.  Specifically, there is no analysis in Dr. Nehemiah's records of Plaintiff's limitations and how those limitations might affect or prevent Plaintiff's ability to perform different types of work.

In rejecting Dr. Nehemiah's conclusory opinion, the ALJ properly applied the factors set forth in 20 C.F.R. § 1527(d)[12] and gave "good reasons for doing so."  *Id.* § 404.1527(d)(2).  She found that most of Dr. Nehemiah's treatment records reflect routine treatment, that there was no indication in his notes or in the record as a whole "as to the onset of [Plaintiff's] mental symptoms, their severity, and their consequential limitations, if any," noted that Dr. Nehemiah was a general practitioner and not a psychiatrist, and found that Plaintiff could not adequately explain "why, if her depression was so severe, she did not seek treatment from a psychiatrist or other mental health care provider."  (Tr. at 161.)  The Court finds no error in ALJ's Rothman's analysis.  *See, e.g.*, *Peterson v. Barnhart*, 219 F. Supp. 2d 491, 497 (S.D.N.Y. 2002) ("We find that the treating physician's rule was not controlling in this case because the assessments by [the doctors] were unclear, conclusory, and based on retrospective analysis.").

---

[12]  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)).

In addition, the ALJ endeavored to obtain further information from Dr. Nehemiah but he did not respond. ALJ Rothman's effort in this regard completed her obligation to develop the record. *See* 20 C.F.R. § 404.1512(e).

For the reasons just explained, as well as for the reasons discussed *supra* regarding the weight of the evidence of Plaintiff's impairments generally pre-March 1998, it was reasonable for the ALJ to conclude that Plaintiff's depressive disorder did not "significantly diminish" her capacity for unskilled work. The Court therefore finds no error in the ALJ's use of the grids.

## CONCLUSION

For all of the reasons stated above, the Commissioner's motion for judgment on the pleadings is **GRANTED** and Plaintiff's motion is **DENIED.** Upon entry of judgment, the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:   Central Islip, New York
         June 9, 2008

                                    ____/s_____
                                    Denis R. Hurley
                                    United States District Judge